## Fallowfield Township Election

*Hugh E. Fergus*, for petitioners; *Meyer Goldfarb*, contra.

BROWNSON, P. J., February 6, 1932.—[The facts found are summarized in the court's discussion.]

Section twenty-nine of the Act of June 10, 1893, P. L. 419, as amended by the Act of April 14, 1897, P. L. 23, provides: "Whenever in any contested election the tribunal trying the case shall decide that the ballots used in one or more election districts were, by reason of the omission, addition, misplacing, mis-spelling or mis-statement of one or more titles of offices, or names of candidates, or parties or policies represented by them, so defective as to the office in contest as to be calculated to mislead the voters in regard to any of the candi-

dates nominated for said office, and that the defective condition of the said ballots may have affected the result of the entire election for said office, the said tribunal shall declare the election to be invalid as regards the said office," etc.

The effect of these provisions would seem to be that, if it were made to appear that "the ballots used in one or more election districts" in voting for the candidates contained this error of omitting the designation of Dworatzek as the candidate of the Democratic Party and substituting therefor the untrue statement that he (as well as Beazell) was nominated by the Republican Party, it would be the duty of the court to declare this election void: Foy's Election, 228 Pa. 14; Snodgrass's Case, 267 Pa. 494.

But what is the meaning of the phrase "the ballots used"? This same phrase occurs in section fifteen of the statute, which provides that all "the ballots used" at the same voting place shall be alike, and shall be printed "upon white paper," etc. It evidently was intended to have the same meaning in each of the instances in which it is employed, and it seems to be clear that, in each instance, it refers to the official ballots used by the electors for the casting of their votes—those which, after marking their choices thereon, they deposit in the ballot box. The intent and meaning of the enactment would appear to be that when the ballots thus used are so printed as to be capable of affecting the result of the voting, it shall be conclusively presumed that an intelligent expression of the voters' will has been interfered with. Upon the mere proof of that state of facts there is a conclusive statutory presumption of the invalidity of the election. The reason why section twenty-nine enacts that the mere fact of there being on those ballots misleading statements, which "*may* have affected the result" of the voting, shall require the election to be declared invalid as to the office in question, is that they have gone into the hands of every voter who participated in the election for the specific purpose of being used by him in casting his vote, and every such voter has thus been exposed to the misleading operation of them, and that it is impracticable to investigate the extent to which such ballots actually did, by misleading voters, affect the result, because such an inquiry, involving as it would calling upon electors to disclose how they marked their ballots, would violate the "secrecy in voting" that article eight, section four of the Constitution, as amended November 5, 1901, requires to be maintained. Such would seem to be the thought and idea which led to the framing of this enactment in the form and language given to it by the legislature. But, be this as it may, I think it clear, upon the language of the enactment, that it refers solely to the official ballots "used" in voting, by being deposited in the ballot box, and that it is only the occurrence of confusing or misleading statements thereon that gives rise to the statutory presumption of invalidity.

In the present case it appears that the official ballots used at this election, i. e., the white ballots upon which electors were to mark their choices (and also the "specimen ballots" officially furnished by the county commissioners to the election officers, and by the latter furnished at the polls to voters), were absolutely correct, having nothing upon them in the way of any misinformation or misleading statement. This being so, the facts do not bring the case within section twenty-nine, and the statutory presumption of invalidity does not arise.

But, apart from section twenty-nine of the statute, if the contestants should be able to show that, by something not coming within the statutory rule therein laid down, voters have been led to misunderstand the situation in sufficient number to justify the conclusion that the result of their voting was (or, perhaps, probably was) different from what it would have been had they not so been deceived, doubtless this election could be set aside upon the general prin-

ciples that are applicable to elections. In such case, however (circumstances sufficient to raise the statutory presumption of invalidity not being shown), the question would appear to be one of fact, and the burden would seem to rest upon the contestants to present competent legal proofs, direct or circumstantial, from which a conclusion of fact, justifying the setting aside of the election, can be drawn.

Let us, then, consider just what the contestants have proved as a basis for the drawing of such a conclusion.

It appears that certain papers, which purported to be but were not true copies of the official ballots, had been to some extent circulated among the electors. As already shown by the findings of fact, these were not officially furnished nor put out by the county commissioners. They were privately printed and furnished and (to the extent to which they were circulated among electors) were privately circulated. They incorrectly represented the Republican Party as having two nominees for the office of justice of the peace—Earl Beazell and Stephen Dworatzek—whereas there was but one justice of the peace to be elected, and the only Republican nominee for that office was Beazell, Dworatzek being the Democratic (instead of the Republican) nominee therefor. The cause of this was a typographical error of a compositor employed in the establishment of the printing company that prepared these papers purporting to be copies of the official ballot, which error escaped attention until after the papers had been printed and circulated. If they had any effect in misleading voters, so as to affect their voting, it could be only by causing persons who did not know the contrary to believe that Mr. Dworatzek had the Republican nomination, and that, therefore, a cross-mark in the Republican square, in the first column of the official ballot, would have the effect of a vote for him; and if thirty-seven persons who desired to vote for Dworatzek were thus misled into placing a mark in the party square for a straight Republican ticket and relying upon this as having the effect of operating as a vote in Dworatzek's favor, the result of the election would be affected.

But, excluding from consideration hearsay testimony (which was ruled upon the trial to be incompetent), there is no clear affirmative proof that more than about twenty-five electors of the township actually saw and read these purported copies before voting. Probably a great many more persons did see them, but this was not proved by legal evidence. Nor is there any competent evidence that any voter was in fact misled by them. There were attempts by one or two witnesses to state, on the basis of hearsay, that certain other persons were under the impression that a mark in the Republican Party square would count as a vote in Dworatzek's favor, but this was not competent evidence, and the persons so referred to were not produced as witnesses so that it could be ascertained by cross-examination whether they remained under that impression until they voted (if in fact they did vote). One witness testified that he had been told this, but on cross-examination it appeared that he was not deceived nor misled, because he knew what the real facts were with reference to the nominations that had been made. (Whether he did or did not undeceive the informant does not appear.) It clearly appeared that not one of the witnesses called to testify was misled, all of them having knowledge that in fact Dworatzek did not have the Republican nomination.

There had been a contest for the Republican nomination at the primary, which was held less than two months before the election, and it is not probable that many persons in the township were ignorant of the true facts. But any intelligent person, even if without information as to the result of the primary, would see at once, from a reading of these purported copies of the ballot, that

there must be some error in them, as they gave notice that but one person was to be voted for, and yet represented the Republican Party as having two nominees (and the Democratic Party as having none). It is true, an ignorant or unintelligent person might be misled; if one of these papers were shown to him, and the fact that Dworatzek's name was followed by the word Republican were called to or attracted his attention, and Beazell's name and the party appellation following it were not noticed, he might be led to believe that a straight Republican mark on the official ballot would count in Dworatzek's favor. But, as already indicated, there is no legal proof that these privately circulated papers were actually seen before voting by a sufficient number of the electors (whether intelligent and well informed, or ignorant or unintelligent) who voted at this election to affect the result, supposing them to have been misled, and that their erroneous impressions were not corrected by an inspection of the official ballot when received at the polling place or otherwise.

It may be that if these incorrect copies of the ballot were intentionally printed incorrectly, with the design of deceiving voters, or were circulated with the fraudulent purpose of misleading Dworatzek's friends and supporters into marking their ballots in a way that would operate to Beazell's advantage, the contestants might be to some extent helped out in their proofs, and the strictness of proof required could be relaxed by the application of a principle analogous to that of the maxim omnia præsumuntur contra spoliatorem, especially in view of the fact that the opposing candidate, Beazell, was instrumental in bringing about such circulation of these papers as is shown to have occurred; but upon that question we do not make any pronouncement, for the reason that the facts found negative any claim (if such be intended to be made) of intentional fraud or fraudulent purpose.

The courts "ought always to be slow to set aside an election for any office:" Foy's Election, 228 Pa. 14, 19; and when they are asked to do this, the facts justifying such action ought to be clearly proved. We do not think the contestants have so proved facts from which it can be found that a sufficient number of electors who participated in this election were, either actually or probably, deceived or misled by these privately circulated papers, to have the effect of disproving or even rendering it doubtful that the candidate returned as elected received the votes, intelligently and intentionally cast in his favor, of a majority of the voters. Moreover, it is to be noted that the petition does not aver, nor make the claim, that the circulation of these papers did in fact affect the result, and it apparently is based entirely upon the theory that section twenty-nine of the statute applies to the case; and it was apparently upon that theory that the case was conducted at the hearing.

### Conclusions of law

1. The facts of the case, as found above, do not bring it within the provisions of section twenty-nine of the Ballot Law, so as to raise a legal presumption, under the rule prescribed in that section, of the invalidity of the election.

2. The contestants have not presented sufficient competent evidence of facts which would justify setting this election aside upon grounds other than those specified in section twenty-nine aforesaid.

### Decree nisi

And now, February 6, 1932, it is ordered that, if no exceptions to the findings of fact and conclusions of law hereinabove set forth be filed within fifteen days, a decree shall be entered dismissing the petition at the cost of the contestants.

From Harry D. Hamilton, Washington, Pa.